IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:11CR194 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| GUILLERMO ORTEGA, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Guillermo Ortega (Ortega) (Filing No. 15). Ortega is charged in the Indictment with the possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). Ortega seeks to suppress all evidence obtained as a result of the search of an apartment at 8405 Ohern Street in Omaha, Nebraska, on May 1, 2011, by officers of the Omaha Police Department (OPD).

An evidentiary hearing was held on Ortega's motion on September 21, 2011. Ortega was present for the hearing along with his counsel, James M. Davis. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. During the hearing, the court heard the testimony of OPD Detective Christopher J. Perna (Detective Perna) and OPD Sergeant Dave Bianchi (Sergeant Bianchi). The witnesses were sequestered upon the defendant's request. The court received into evidence Exhibit 102 - affidavit and application for issuance of a search warrant. A transcript (TR.) of the hearing was prepared and filed on September 27, 2011 (Filing No. 24).

**FINDINGS OF FACT**

On April 30, 2011, Sergeant Bianchi, a nineteen year veteran of the OPD, received a telephone call from an Arizona drug task force member relating that a load of methamphetamine was coming to Omaha in a particular vehicle to the Citadel Apartments (TR. 34-35, 58-61, 74-75). Prior to this time, a drug investigation regarding the Citadel Apartments had been ongoing pertaining to methamphetamine trafficking (TR. 59, 77). On May 1, 2011, officers of the OPD narcotics unit commenced surveillance of the Citadel Apartments waiting for the vehicle to arrive from Arizona (TR. 36). Numerous officers

participated in the surveillance because the Citadel Apartments' complex is large with several separate buildings, all of which the officers needed to observe for the comings and goings (TR. 21, 37). These officers communicated through radio and telephone contact (TR. 36).

In the middle to late morning, the officers observed a black Hyundai vehicle, bearing Arizona license plates as described by the Arizona task force, arrive at the Citadel Apartments and park in garage number eighty-nine, which is a one-car garage in a row of connected garages detached from any apartment building (TR. 37, 39, 75). The officers observed individuals close the garage door (TR. 39). Within one hour, an individual arrived in a red truck and carried a black box resembling a tool box into the garage accompanied by an empty-handed individual, who was wearing a rugby shirt and later identified as Ortega (TR. 41). Sergeant Bianchi found the individuals' behavior significant because frequently when illegal drugs are transported in a vehicle across state lines, the drugs are concealed in hidden compartments requiring tools to gain access (TR. 44).

Upon exiting the garage, the same individual was carrying the black box and Ortega was carrying a red cooler (TR. 41). Sergeant Bianchi believed the cooler contained illegal drugs removed from the black Hyundai (TR. 44). The officers saw Ortega enter a secured door to the apartment building located at 8405 Ohern, but could not see which particular apartment he entered (TR. 42, 46).

Shortly after Ortega entered the building, Sergeant Bianchi and other officers arrived at the apartment building located at 8405 Ohern (TR. 45-46). Sergeant Bianchi and four or five other officers entered the secured door when someone from inside opened the door (TR. 47). The officers fanned out through the common areas of the building in an attempt to ascertain Ortega's location (TR. 47-48). Not finding Ortega, Sergeant Bianchi began knocking on apartment doors starting with the apartment on the main floor closest to the secured entrance (TR. 48). The occupant answered the door immediately and gave consent for Sergeant Bianchi to search for Ortega (TR. 49). Not finding Ortega, Sergeant Bianchi left the apartment and proceeded to the next apartment (TR. 49). At that time, Sergeant Bianchi received information by radio transmission from OPD Officer Jen Hansen that garage eighty-nine was rented by the individuals renting apartment eleven in the apartment building located at 8405 Ohern (TR. 19-20, 49). Sergeant Bianchi proceeded

to the third and top floor to apartment eleven, knocked several times, and announced "police" and "policia" without response (TR. 50, 52).

At the same time and in compliance with an order issued by Sergeant Bianchi, Detective Perna conducted a traffic stop of a red Ford Ranger driven by Francisco Garcia-Pena (Garcia-Pena), at approximately 84th and Q streets on an entrance road to the Citadel Apartments (TR. 7-8). Detective Perna has been employed with the OPD for over twelve years and has been a narcotics detective for three years investigating many types of narcotics activity in Omaha, Nebraska (TR. 5-6). At approximately 1:45 p.m., Detective Perna placed Garcia-Pena in custody and stayed with him while other officers went to make contact with other suspects, including Ortega (TR. 8, 17). Detective Perna and Garcia-Pena were standing or sitting outside the vehicles (TR. 9). The weather was sunny and about 70 degrees (TR. 9).

Detective Perna was located south of the Citadel Apartments looking north (TR. 9). Detective Perna was overlooking the back of detached garages and Ohern Street (TR. 9). Detective Perna could see OPD Detective Kenner Hatfield who was seventy-five to one hundred yards away, standing outside of the apartment building at 8405 Ohern Street (TR. 10). Within five to seven minutes of detaining Garcia-Pena, Detective Perna saw a man wearing a white t-shirt attempting to push the window screen out of a third floor apartment window in the 8405 Ohern Street building (TR. 10-11, 27). Detective Perna also saw, behind the first man, a second man wearing a multi-colored rugby shirt (TR. 11). During the earlier surveillance Detective Perna had seen the man wearing the rugby shirt associated with garage eighty-nine (TR. 11). It appeared to Detective Perna that the two men were going to try to go out of the window (TR. 12). Detective Perna also saw Sergeant Bianchi at the top of the glassed-in stairwell just outside the door to the apartment occupied by the men at the window (TR. 12-13). Detective Perna used his police radio to alert Sergeant Bianchi about the two males "trying to go out the third floor window" (TR. 13-14). The window was directly above Detective Hatfield who looked up and saw the men (TR. 14). The two men looked at Detective Perna and retreated away from the window (TR. 14-15).

After hearing about the men at the window, Sergeant Bianchi understood the men, including his suspect, were "jumping out the window" of apartment eleven (TR. 52-53).

Sergeant Bianchi immediately kicked the door in and entered apartment eleven (TR. 53). Sergeant Bianchi testified he "felt [his] suspects were escaping out the third floor window, and [he] also had huge concerns that if they were doing that, somebody could be in there destroying the methamphetamine" (TR. 53). Sergeant Bianchi estimated thirty seconds passed between his first knocking on apartment eleven's door and kicking the door in (TR. 53).

Upon entering the apartment, Sergeant Bianchi observed two males retreating from the window to stand in the livingroom (TR. 54). Sergeant Bianchi "pointed his weapon at them and told them to get on the ground" (TR. 54). The two men complied without incident (TR. 54). Sergeant Bianchi and the other officers walked around the apartment looking for other individuals (TR. 54). Finding none, the officers secured the two men (TR. 54). Sergeant Bianchi told the other officers not to search because they would seek a search warrant (TR. 54-55). However, Sergeant Bianchi saw two large bags of what appeared to be methamphetamine on the kitchen counter (TR. 55). Sergeant Bianchi believed the officers had facts sufficient for probable cause to support a search warrant before he observed the methamphetamine (TR. 55). Ultimately, the officers sought and obtained a search warrant for apartment eleven (TR. 55; Ex. 102). The affidavit in support of the search warrant is set forth below.

> The Citadel Partnership Leasing Office, indicates 8405 Ohern Street, Apartment # 11 and garage # 89 are both currently leased to Emeterio ROSAS-GAMEZ.
>
> * * *
>
> Affiant Officer [and other officers], have been conducting an on-going, narcotics investigation, of a large scale methamphetamine operation at the Citadel Apartments, located near 84th & Q streets, in Omaha, Douglas County, Nebraska, since December of 2010. During the investigation conducted by Agents of Homeland Security, a credible and reliable informant, provided agents with information that 8405 Ohern Street Apartment # 11, was being used as a "stash house", where multiple pounds of methamphetamine were being divided and packaged for resale. This informant stated two Hispanic males, identified as "Compadre" and "Chompito" were the main parties involved in the receipt and distribution of methamphetamine. This informant later identified "Chompito" as Emeterio ROSAS-GAMEZ, from a photograph. Agents with

Homeland Security later confirmed ROSAS-GAMEZ was currently leasing apartment # 11.

On Sunday, 01 May, 2011 at approximately 1200 hours, Affiant Officer, along with officers of the Metro Omaha Narcotics Task Force, received information from a confidential, reliable informant that narcotics activity was occurring in garage # 89, at the Citadel Apartment Complex. Officers began a surveillance operation on garage # 89 and observed two Hispanic male parties enter the garage and close the overhead door. Douglas County Sheriff's Deputy Kramer #S-368 observed Party # 1, described as a Hispanic male, wearing a purple collared shirt with horizontal white stripes and black jeans, exit the garage a short time later and walk towards the apartment building, carrying a red and white cooler. Deputy KRAMER indicated this party entered the garage carrying nothing and exited carrying the cooler. Affiant Officer knows from past experience, that large scale drug dealers, attempting to conceal large amounts of narcotics will often use coolers to transport and conceal the narcotics when going from one location to another. Party # 2, described as a Hispanic male, wearing a grey and green long sleeved shirt, blue jeans and carrying a tool box, was observed entering the driver's seat of a red, Ford Ranger pick-up truck and drive from the area. Officers made contact with party # 2 who consented to a search of his vehicle. No narcotics were located as a result of that search.

Officers briefly lost sight of party #1, who was believed to have entered the apartment building. Omaha Police Officer Jennifer HANSEN # 1585, then made contact with Citadel Apartment Staff in the leasing office. Officer HANSEN was informed that garage # 89 is leased to ROSAS-GAMEZ, who is also currently leasing an apartment, located at 8405 Ohern Street # 11.

Surveillance officers then proceeded to 8405 Ohern Street Apartment # 11, for purposes of a knock and talk investigation. Officers began to knock and identify themselves and could hear unknown parties running around inside the apartment. Outer perimeter officers then advised that a party, matching the description of part [sic] # 1 was observed trying to flee by exiting the top floor windows. Fearing an escape was taking place, Sgt. Dave BIANCHI # 1263 of The Omaha Police Department forced open the apartment door to prevent an escape. Officers then cleared the remainder of the apartment

>for additional suspects and observed a large amount of suspected methamphetamine on a table inside the apartment.

Ex. 102.

## LEGAL ANALYSIS

Ortega argues the officers' warrantless entry into apartment eleven cannot be justified by exigent circumstances and thus violates his Fourth Amendment rights.[1]  **See** Filing No. 16 - Brief p. 3-6.  Accordingly, Ortega contends any evidence discovered after the officers entered apartment eleven should be suppressed as fruit of the unlawful entry.  *Id.* at 6.  The government argues the exigent circumstance exception to the warrant requirement justifies the officers' entry based on concerns for the safety of the individuals at the window, to prevent the imminent destruction of evidence, and to prevent a suspect from escaping.  **See** Filing No. 18 - Response p. 4, TR. 99-100.

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "'With few exceptions,' the Supreme Court has required that police obtain a warrant before searching a person's home." *United States v. Kelley*, 652 F.3d 915, 917 (8th Cir. 2011) (**quoting** *Kyllo v. United States*, 533 U.S. 27, 31 (2001)).  Accordingly, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  "The warrant requirement is subject to 'certain reasonable exceptions' because the 'touchstone of the Fourth Amendment is reasonableness.'" *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011).  One such exception is when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978).

---

[1] Ortega's argument under the Fourth Amendment *assumes* he had a reasonable expectation of privacy in Mr. Rosas-Gamez's apartment.  *United States v. McIntyre*, 646 F.3d 1107, 1111 (8th Cir. 2011); *United States v. Crippen*, 627 F.3d 1056, 1064 (8th Cir. 2010).

6

**A.     Emergency Aid**

The "legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries." *United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1028-29 (8th Cir. 2007) (finding officers were objectively justified in entering the home and bedroom without a warrant with reliable information that suspect had locked himself in a bedroom with a gun and that he was very upset over the disintegration of his marriage). The court evaluates a two-part test to determine whether the risk of personal danger created exigent circumstances: "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Najar*, 451 F.3d 710, 717-18 (10th Cir. 2006); **see** *Brigham City*, 547 U.S. at 405-06 (noting officers' warrantless entry was "plainly reasonable" when "officers were confronted with *ongoing* violence occurring *within* the home"). Under this analysis, "[t]he officer's subjective motivation is irrelevant." *Brigham City*, 547 U.S. at 404. The court is "guided by the realities of the situation presented by the record. [The court] should evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers." *United States v. Martinez*, 643 F.3d 1292, 1296 (10th Cir. 2011). For this reason, the emergency aid exception depends on "'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger," not on an officer's subjective belief. *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009) (**citing** *Brigham City*, 547 U.S. at 404-05)). By contrast, "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Fisher*, 130 S. Ct. at 548.

In this matter, reliance on the emergency aid exception to the warrant requirement is misplaced. While the court credits the officers' testimony about seeing and hearing that the men in apartment eleven were pushing the screen out and attempting to "go out" or "jump out" the window, the court finds no evidence to suggest the men were in immediate danger or need of assistance. The officers observed that although the men initially attempted to remove the window screen, upon seeing the officers outside and hearing the officers at the door, the men moved away from the window. In any event, while the government argues this exception applies, the officers did not rely on the emergency aid exception to enter apartment eleven. The court does not rely on the officers' subjective

belief regarding the danger to the occupants, however the court takes into consideration the officers' lack of concern for the men's safety when evaluating the objective reasonableness that there was an immediate need to enter apartment eleven to protect the lives or safety of the men at the window.  In any event, once the entering officers observed the men, who had stepped safely away from the screened window, any additional search within the apartment became unreasonable.  Under the circumstances presented by the evidence before the court no risk of personal danger created exigent circumstances.

### B.      Hot Pursuit of Fleeing Suspect

"Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect."  *King*, 131 S. Ct. at 1856.  Similarly, the Eighth Circuit notes the exigent circumstances exception justifies immediate police action without obtaining a warrant if "a suspect's escape is imminent."  *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010).  The determination of whether a suspect's escape is *imminent* necessarily includes an assessment of the "risk that the suspect may escape from the residence undetected."  *United States v. Oung*, 490 F. Supp. 2d 21, 30 (D. Mass. 2007) (**quoting** *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995) (**quoting** *Hegarty v. Somerset County*, 53 F.3d 1367, 1374 (1st Cir. 1995) (**citing** *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (listing exigencies as including "the need to prevent a suspect's escape")))).  Moreover, where an escape is threatened the totality of the circumstances incorporate the suspect's potential for a successful escape from inside the residence.  **See** *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540 (1st Cir. 1996).  The government fails to bring attention to any cases suggesting the circumstances present in the case at bar are sufficient to employ the imminent escape exigent circumstances exception justifying the officers' conduct in this case.  **But see** *United States v. Reed*, 15 F.3d 928, 934 (9th Cir. 1994) (finding officers acted reasonably when they forced entry through a hotel room door after suspect saw officers and closed door where he was likely armed, might flee from a window, and had a record of criminal activity); *United States v. MacDonald*, 916 F.2d 766, 770-71 (2d Cir. 1990) (finding exigency already existed but was "intensified" after law enforcement knocked and announced themselves because "the agents heard the sound of shuffling of feet from inside the apartment and simultaneously

received a radio transmission that the suspects were attempting to flee through a window of the first floor apartment").

Clearly, Sergeant Bianchi was not in hot pursuit of a fleeing suspect. The officers had Ortega under surveillance, had lost him, and were in the process of determining which apartment, if any, he had entered. In fact, there is no indication Ortega knew the officers were present. The evidence presented during the hearing suggests the men, including Ortega, at the window began removing the screen before officers knocked on the apartment door, although it is likely the men heard the officers in the common areas prior to knocking. The men apparently saw and heard Detective Perna, then the knocking and entry of Sergeant Bianchi in rapid succession.

The issue before the court is whether the officers had an objectively reasonable basis to believe there was an immediate need to enter the apartment to avert a suspect's imminent escape. The suspects were located on the third floor of the apartment complex. Officers were on the ground in view of and viewing the suspects. More than one dozen officers were present. The court considers the circumstances that confronted police at the time of the entry from the perspective of what a reasonable, experienced police officer would believe. **See** *Cisneros-Gutierrez*, 598 F.3d at 1004. The suspects' activity at the window may reasonably have been believed to be an *attempt* to escape, however the court finds under the circumstances no objectively reasonable basis existed for believing the suspects' escape was imminent.

### C. Destruction of Evidence

"[T]he need 'to prevent the imminent destruction of evidence' has long been recognized as a sufficient justification for a warrantless search." *King*, 131 S. Ct. at 1856. Here, the government presented some evidence that officers feared evidence was in danger of destruction. The issue remains whether "grounds to believe there was a fair probability that evidence of drug trafficking—a serious felony offense—would be lost if they did not make immediate entry." *Cisneros-Gutierrez*, 598 F.3d at 1004 (**quoting** *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005)). "A warrantless search of a residence is justified, therefore, to prevent the destruction of evidence if factual circumstances demonstrate 'a sufficient basis for an officer to believe somebody in the

9

residence will likely destroy evidence.'" *United States v. Munoz*, 894 F.2d 292, 296 (8th Cir. 1990) (**quoting** *United States v. Beck*, 662 F.2d 527, 530 (8th Cir.1981)). In fact, Eighth Circuit courts "have held in a number of cases that police officers are justified in making an exigent-circumstances entry when, after going to a residence with evidence that an individual was involved in a drug transaction, they knock and identify themselves and then witness an individual retreat or conduct himself in a way that suggests the destruction of evidence." *Cisneros-Gutierrez*, 598 F.3d at 1004 (citing cases describing suspects who, after observing officers, engaged in conduct such as fleeing into the residence; running upstairs; and retreating after approaching the door then making "scrambling noise"). However, "[t]he government bears the burden of demonstrating specific, articulable facts that support a reasonable belief that other persons are in the residence . . . who might destroy evidence." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988) (finding although the officers had formed a suspicion that a drug transaction was occurring they had no particularized evidence to support the existence any other persons in the apartment or that any possible drugs were in danger of destruction). The court "look[s] objectively at whether a reasonable, experienced police officer would believe evidence was in danger of removal or destruction." *Cisneros-Gutierrez*, 598 F.3d at 1004.

     Because the government failed to provide any evidence to establish a basis for the officers' belief there were other occupants in the apartment or evidence was in danger of removal or destruction, the exigent circumstances exception to the warrant requirement does not justify the officers' subsequent entry and protective sweep. At the time Sergeant Bianchi kicked the apartment door in, entered the apartment, and pointed his weapon at two men telling them to get on the ground, he had no specific, particularized basis for believing that his or another's safety was threatened or that evidence was being destroyed. The officers saw two men at the window, but no evidence suggests any officer heard movement or sounds associated with destruction of evidence inside the apartment. Sergeant Bianchi testified "[he] also had huge concerns that if [two men were trying to escape], somebody could be in there destroying the methamphetamine" (TR. 53) because "that's pretty common" (TR. 71). However, "the 'mere possibility of loss or destruction of evidence is insufficient justification' for a warrantless entry, instead '[a]ffirmative proof of

10

the likelihood of the destruction of evidence, along with the necessity for warrantless entry are required.'" *Modrell v. Hayden*, 636 F. Supp. 2d 545 (W.D. Ky. 2009) (quoting *United States v. Radka*, 904 F.2d 357, 362-63 (6th Cir. 1990)). There has been no argument or evidence in this case suggesting the officers "created" exigent circumstances by their presence outside the apartment building or knocking on the door, aside from the fact that "in some sense the police always create the exigent circumstances." *King*, 131 S. Ct. at 1857. The court finds the officers violated Ortega's Fourth Amendment rights by breaching the threshold of the apartment door. The officers' observation of methamphetamine in the kitchen was unlawful. Accordingly, any description of the apartment or its contents gained from the illegal entry should be excised from the affidavit and application for the search warrant.

**D.     Inevitable Discovery**

Because the officers illegally entered apartment eleven, the court must determine whether the evidence subsequently acquired should be excluded on that basis alone. The exclusionary rule prohibits the admission of evidence unconstitutionally obtained. *Weeks v. United States*, 232 U.S. 383 (1914). The rule also applies to evidence, tangible and testimonial, which was derived, directly or indirectly, from the unconstitutionally obtained evidence, i.e., the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487 (1963); *Nardone v. United States*, 308 U.S. 338 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920). Even though the exclusionary rule may require the exclusion of all evidence obtained by exploitation of an illegal search and seizure, the evidence may still be admissible into evidence if the evidence is gained by means sufficiently distinguishable to be purged of the primary taint of the illegality. To that extent, three general exceptions have been carved from the exclusionary rule. One of those exceptions, the "inevitable discovery" doctrine, is potentially applicable here. Where the government can establish that it would have inevitably discovered the challenged evidence without reference to the illegal conduct giving rise to the primary taint, such evidence will not be excluded as fruit of the poisonous tree. See *Nix v. Williams*, 467 U.S. 431 (1984).

> To prevail under the inevitable discovery doctrine, the government must show: (1) that there was a reasonable

> probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.

*United States v. Romo-Corrales*, 592 F.3d 915, 920 n.5 (8th Cir. 2010) (quotation omitted).

In this case, the government was pursuing a lawful means of investigation and sought a search warrant in connection with apartment eleven. Accordingly, to determine whether there was a reasonable probability that the evidence would have been discovered by use of the search warrant, the court must evaluate the sufficiency of the warrant application without the evidence obtained based solely on the unlawful entry.

"A court's determination of whether probable cause exists to support a warrant requires a consideration of the totality of the circumstances . . . . When a search warrant application has been redacted as in this case, the sufficiency of the warrant affidavit is evaluated without the redacted information." *United States v. Turner*, 431 F.3d 332, 336 (8th Cir. 2005) (**citing** *Illinois v. Gates*, 462 U.S. 213, 230, 236 (1983)). "When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists." *United States v. McIntyre*, 646 F.3d 1107, 1115 (8th Cir. 2011) (internal quotations and citations omitted). The court "examine[s] the sufficiency of a search-warrant affidavit using a 'common sense' and not a 'hypertechnical' approach." *Id.*

The affidavit contains information that provides the officers with a fair probability that contraband or evidence of a crime would be found in apartment eleven. While Ortega's conduct related to garage eighty-nine and apartment eleven may have appeared innocent to a member of the public when seen in isolation, such conduct in association with the officers' previous investigation and information received from at least one informant and the Arizona drug task force justifies the officers' suspicions that evidence reflecting possession and distribution of illicit drugs would be found in apartment eleven and garage eighty-nine. Specifically, for example, the officers had information apartment eleven was being used as a methamphetamine stash house. Apartment eleven was leased by a Hispanic male. A vehicle suspected of carrying methamphetamine entered garage eighty-nine. Two Hispanic males entered the garage with a tool box. One Hispanic male left the

garage with a cooler and walked toward the apartment building. The same individual who leased garage eighty-nine also leased apartment eleven. Although surveillance officers lost site of the man with the cooler, as the officers approached apartment eleven on the third floor, another officer announced the same individual seen near garage eighty-nine could be seen at the window on the third floor. Under the totality of the circumstances, the application and affidavit contains sufficient probable cause to support issuance of the search warrant at issue here, even without the additional information obtained after the officers illegally entered the apartment. Accordingly, since there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, Ortega's motion to suppress should be denied.[2]

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Guillermo Ortega's motion to suppress (Filing No. 15) be denied.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 28th day of October, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

[2] "When moving to suppress evidence on the basis of an alleged unreasonable search, the defendant has the burden of showing a legitimate expectation of privacy in the area searched." **See** *United States v. Stults*, 575 F.3d 834, 842 (8th Cir. 2009). The defendant presented no evidence, and none otherwise exists in the record, to suggest he had any expectation of privacy in Mr. Rosas-Gamez's apartment.